**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| Delwyn Birkhofer,<br><br>Plaintiff,<br><br>v.<br><br>DNA Genetics, LLC, and Pillen Family Farms, Inc.,<br><br>Defendants. | Case No.: ____________________<br><br>**COMPLAINT AND JURY DEMAND** |

## INTRODUCTION

1. On or about April 19, 2021, Defendants DNA Genetics, LLC and Pillen Family Farms, Inc. hired Plaintiff, Delwyn Birkhofer, to serve as their Chief Operating Officer ("COO").

2. But from the very beginning, Defendants made their age-based animus clear, stating for instance in recruiting materials for the COO role that their preferred candidate was someone with a "[d]esire to be part of a young, energized and committed team."

3. They also made their disability-related animus clear. Defendants are self-insured and pay close attention to their healthcare costs, keeping track of high-cost employees. They wrote in 2024 encouraging their employees "to explore other options during this open enrollment period" due to rising costs.

4. Shortly after Plaintiff turned 61 years old, and shortly after Plaintiff told Defendants about a family member's disability and genetic disorder that could have required expensive, ongoing treatments, Defendants terminated Plaintiff on the basis that it "was not working out," despite strong performance reviews and evaluations.

5. Defendants also denied Plaintiff severance and gave as the reason for denial that they do not offer severance. But Plaintiff was a part of conversations where Defendants discussed providing severance to a similarly situated Black employee (Plaintiff is white), meaning that this stated reason for denying severance is false.

6. Plaintiff now brings this lawsuit. He alleges violations of the Age Discrimination in Employment Act ("ADEA"), Americans with Disabilities Act ("ADA"), Genetic Information Nondiscrimination Act ("GINA"), Title VII of the Civil Rights Act ("Title VII") and other claims as described further below.

7. He seeks to recover all remedies available under law.

## PARTIES

8. Plaintiff Delwyn Birkhofer is a citizen and resident of Texas. Plaintiff resides in Flower Mound, Texas.

9. Plaintiff previously resided in Columbus, Nebraska when he was employed by Defendants as their COO.

10. Plaintiff was 56 years old at the time of his hiring.

11. He was 61 years old at the time of his termination.

12. Defendant DNA Genetics, LLC, is a Nebraska limited liability company with its principal office located at 4438 Old Mill Court, Columbus, Nebraska, 68601.

13. Sarah Pillen and Brock Pillen are the co-Chief Executive Officers (the "co-CEOs") of DNA Genetics, LLC.

14. Defendant Pillen Family Farms, Inc., is a Nebraska corporation with its principal office located at 4438 Old Mill Court, Columbus, Nebraska, 68601.

15. The president of Pillen Family Farms, Inc. is James Pillen.

16. James Pillen, Sarah Pillen, and Brock Pillen are all directors of Defendant Pillen Family Farms, Inc.

17. Defendants DNA Genetics, LLC and Pillen Family Farms, Inc. are commonly owned and controlled by members of the Pillen family, share a principal office at 4438 Old Mill Court, Columbus, Nebraska, share executive management (including co-CEOs Sarah Pillen and Brock Pillen) and share human-resources, payroll, and benefits functions. Both entities appear interchangeably on Plaintiff's key documents. Because their operations are interrelated and they share common management, centralized control of labor relations, and common ownership, Defendants constitute a single integrated enterprise and, alternatively, were

Plaintiff's joint employers, and each is liable for the conduct alleged in this Complaint.

18. Defendant DNA Genetics, LLC is a swine genetics company.

19. Pillen Family Farms, Inc. is a network of farms that raise swine and also includes feed milling, agronomy operations, transportation, maintenance, etc.

20. Together, Defendants employ over 1,000 individuals.

21. At all relevant times, Plaintiff was an "employee" under applicable law and Defendants were each his "employer."

## **JURISDICTION**

22. The Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331.

23. The Court has supplemental jurisdiction over Plaintiff's claims under Nebraska law pursuant to 28 U.S.C. § 1367.

## **VENUE**

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because both Defendants reside in Nebraska and a substantial part of the events giving rise to the claims occurred in Columbus, Nebraska.

## ADMINISTRATIVE EXHAUSTION

25. Plaintiff timely dual-filed his charge with the Equal Employment Opportunity Commission ("EEOC") as well as the Nebraska Equal Opportunity Commission ("NEOC"), on February 1, 2026.

26. Plaintiff requested that the EEOC take lead in investigating his charge.

27. Plaintiff filed an amended charge with the EEOC on September 9, 2026, which relates back to the original charge under 29 C.F.R. § 1601.12(b).

28. On October 8, 2026, the EEOC issued Plaintiff a Right to Sue Notice.

29. Plaintiff files this action within 90 days of that Right to Sue Notice.

## FACTS

### A. Plaintiff's Hiring, His Strong Performance, and Defendants' Age-Based Animus.

30. In their 2021 recruitment materials for the COO position, Defendants listed a "[d]esire to be part of a young, energized and committed team" as one of the COO role's key responsibilities.

31. Plaintiff applied for the position.

32. While Plaintiff interviewed with Sarah and Brock Pillen, it was James Pillen who made the final decision to hire Plaintiff.

33. Plaintiff was 56 years old at the time of his hiring. He was also in-shape and looked relatively younger than his age.

34. After obtaining the COO role, Plaintiff uprooted his family from an Atlanta suburb in Georgia and moved to Columbus, Nebraska, a rural environment, so he could report to Defendants' headquarters in person.

35. In his role as COO, Plaintiff reported to Defendants' co-CEOs and siblings, Sarah and Brock Pillen.

36. The co-CEOs were in their late 30s or early 40s at the time of Plaintiff's hiring.

37. From 2021 to 2025, Plaintiff successfully performed in his position and was repeatedly given strong annual performance reviews (though he was given little or no autonomy and had no real control over pricing or contracts).

38. But Defendants' discriminatory animus was also highlighted in these reviews.

39. Plaintiff's 2022 performance review, for instance, highlighted his professionalism, listening skills, and responsiveness. In general, he was considered "the right cultural fit."

40. At the same time, one of the opportunities listed in Plaintiff's 2022 performance review was for him to "[c]ontinue to build a strong Sales Team and *add youth to the organization*. We are on a timer that is beginning to run low with Mike." (Emphasis added.) The "Mike" referenced was the Director of Sales and in his early to mid-60s at the time. The co-CEOs had made comments about Mike's

inability to connect with and motivate other sales team members. It was not lost on Plaintiff that Defendants likely also viewed him as being on a timer that would soon be running low, especially once Plaintiff also turned 60 years old.

41. Defendants employed relatively few individuals 60 years old or older, and even relatively few individuals over 50 years old. In fact, evidence would likely show that Defendants hired few if any individuals over 40 years old during Plaintiff's employment.

42. Plaintiff's 2023 performance review recognized that it had "been a challenging year from a business/economics perspective." It also, however, made clear that Defendants were "still incredibly proud of the actions and behaviors of" Plaintiff and his team.

43. Also in 2023, Defendants hired a third party to conduct employee surveys of all of its leaders. The "Key Insight Scores" for Plaintiff from this survey showed that he was rated the same as Defendants' other leaders on a manager rating, slightly worse than other leaders on the organization rating, and better than other leaders on the retention rating. Overall, Plaintiff was highly rated and generally on par with the other organization leaders who were surveyed.

44. Defendants gave Plaintiff a glowing review in his 2024 assessment, stating that "[i]t's hard to believe that Del has been with us for almost four years now" and that, "[d]uring this time, we have navigated numerous known and

unknown obstacles and challenges." This performance review also noted that "[o]ne of Del's standout qualities is his character and integrity. He is a hard worker and excels at building one-on-one relationships with customers. These qualities are invaluable and have been a significant asset to our team." There were significantly fewer "opportunities" listed for Plaintiff in this performance review as compared to prior performance reviews.

45. Defendants also conducted employee surveys in 2024, as it had in 2023. This time, the "Key Insight Scores" for Plaintiff showed that he improved significantly over Defendants' other leaders. Plaintiff's manager rating again matched that of Defendants' other leaders, but Plaintiff performed *better* than those other leaders on both the organization rating and retention rating. In fact, Plaintiff's organization and retention scores were now even better than the average of top performers from other organizations across the country. Plaintiff received these excellent reviews in 2024 despite having been assigned additional leadership duties following the transition of Defendants' National Sales Director to part-time status.

46. During one of the weekly meetings between the co-CEOs and Plaintiff early in the fourth quarter of 2024, the co-CEOs directed Plaintiff to ask his older team members about their intended retirement age. This was part of the general desire to promote a "young" culture and workforce. Plaintiff also learned that the

co-CEOs directly asked older members of Plaintiff's team about their retirement age. The co-CEOs made these inquiries in April 2025.

**B. Defendants Learn About Plaintiff's Association With a Disabled Individual.**

47. On February 4, 2025, Plaintiff's granddaughter was seen by a hematologist at Children's Hospital in Omaha.

48. Plaintiff and his wife have legal custody of their granddaughter.

49. The doctors discussed with Plaintiff's wife that their granddaughter had Alpha Thalassemia, and that, given her age, she would likely soon require ongoing blood transfusions and chelation therapy.

50. These therapies can be very expensive and are expected to last a lifetime.

51. Plaintiff's family was insured through Defendants.

52. Defendants utilized a self-funded or self-insured health plan, meaning that Defendants paid employees' health insurance claims out of their own assets.

53. Because Plaintiff had legal custody of his granddaughter, she was enrolled on his health insurance, which meant that her treatments would be paid for by Defendants.

54. On February 6, 2025, during a two-on-one weekly meeting with the co-CEOs, Plaintiff mentioned his granddaughter's Alpha Thalassemia diagnosis

and said that she would be dealing with low hemoglobin and would likely need ongoing blood transfusions and chelation therapy for the rest of her life.

55. Alpha Thalassemia is an inherited blood disorder and typically results from deletions involving the HBA1 and HBA2 genes. *See* MedlinePlus, "Alpha thalassemia," last visited October 5, 2026, https://medlineplus.gov/genetics/condition/alpha-thalassemia/.

56. Alpha Thalassemia is a recognized disability, and the need for ongoing blood transfusions and chelation therapy substantially limits one or more major life activities.

57. Sarah Pillen had intimate knowledge of blood disorders and related expenses due to a recent experience with a close family member.

58. Ms. Pillen responded that they "didn't know she had that," but then neither of the co-CEOs offered other support or asked any questions about the granddaughter's wellbeing, which was very unlike them and went against the company's ethos to care about family and connection. Instead, the co-CEOs quickly changed the subject.

59. Defendants had previously made clear that they were having issues with healthcare costs and that they took a dim view of its employees who had serious health issues because they increased such costs. During an early or mid-2024 leadership meeting, for example, Sarah Pillen made negative comments about

how a handful of the company's employees accounted for approximately 80% of the company's healthcare costs, making clear that the co-CEOs were likely privy to sensitive health information.

60. Around the same time that Ms. Pillen made these comments, Plaintiff's wife underwent expensive healthcare treatment while covered by Defendants' self-insured healthcare plan.

61. A letter from Defendants to its employees regarding open enrollment for 2024 stated that Defendants covered "75% of health insurance premiums" and that this premium "will have to increase to offset the increased health care dollars spent on [Defendants' self-insured] plan." The letter, therefore, encouraged employees to find alternative healthcare options, such as considering marketplace coverage or joining a spouse's insurance plan.

62. After the disclosure about his granddaughter, Defendants' treatment of Plaintiff changed dramatically, with Plaintiff being excluded from meetings and decision-making processes that he had previously participated in, and his role in hiring and operational decisions (while already very limited) was reduced further.

**C. Defendants Terminate Plaintiff.**

63. On May 1, 2025, Plaintiff was abruptly terminated during a meeting with the co-CEOs.

64. The termination was abrupt and shocking in part because Defendants had just entrusted Plaintiff to lead their significant semi-annual sales strategy meeting to map out plans for the upcoming months, which was very successful and had ended just days before the termination.

65. The only explanation offered for the termination at the time was that it was "not working out."

66. Plaintiff was 61 years old at the time.

67. Plaintiff asked if there would be severance. "We don't pay severance," Brock Pillen responded, "that is the difference between a smaller and a larger company." When Plaintiff reminded the co-CEOs that he had been in earlier conversations with them about offering severance to another former employee who was Black, the co-CEOs looked at each other in confusion, apparently having forgotten that Plaintiff was a part of those conversations. Mr. Pillen then changed the reason for denying severance, saying that they thought that Plaintiff had been paid well.

68. Defendants later hired an individual for a "Director of Sales" role, which was in practice a replacement for a portion of Plaintiff's role. The individual hired for the Director of Sales role was younger than Plaintiff. The replacement also appeared much younger than his years.

## CAUSES OF ACTION

### COUNT I

### Age Discrimination—ADEA, 29 U.S.C. § 623(a)(1)

69. Plaintiff incorporates the preceding paragraphs.

70. Plaintiff was 56 years old when Defendants hired him and 61 years old when they terminated him. He was, at all relevant times, within the class protected by the ADEA. 29 U.S.C. § 631(a).

71. Plaintiff was qualified for his position and was meeting Defendants' legitimate expectations as Defendants' own written performance reviews and leadership-survey results confirm.

72. Defendants discharged Plaintiff and otherwise discriminated against him with respect to the terms, conditions, and privileges of his employment because of his age.

73. Defendants' age-based motive is shown by, among other things, their stated preference for a "young" team, their written instruction that Plaintiff "add youth to the organization," their reference to an older colleague being on a "timer," their directive that Plaintiff ask older employees about their retirement plans, the absence of any legitimate explanation for the termination, and Defendants' partial replacement of Plaintiff with a younger individual.

74. Defendants' violation of the ADEA was willful. Defendants knew that, or acted in reckless disregard of whether, their conduct violated the ADEA. 29 U.S.C. § 626(b).

75. As a direct result of Defendants' conduct, Plaintiff has lost wages, bonuses, and benefits, and has incurred other pecuniary losses, in amounts to be proven at trial.

**COUNT II**

**Discrimination Because of Association With an Individual With a Disability—ADA, 42 U.S.C. §§ 12112(a), 12112(b)(4)**

76. Plaintiff incorporates the preceding paragraphs.

77. Plaintiff was at all relevant times a "qualified individual" within the meaning of 42 U.S.C. § 12111(8). He was able to perform, and was performing, the essential functions of his position.

78. Plaintiff's granddaughter is an individual with a disability within the meaning of 42 U.S.C. § 12102(1). Alpha Thalassemia is a physical impairment that substantially limits one or more major life activities, including the operation of major bodily functions such as the hemic and circulatory systems and normal cell growth. 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii).

79. Plaintiff has a family relationship and association with his granddaughter, and she was enrolled as his dependent on Defendants' group health plan.

80. Defendants knew of Plaintiff's granddaughter's disability and of Plaintiff's relationship with her no later than February 6, 2025, when Plaintiff informed the co-CEOs of her diagnosis and anticipated lifelong treatment.

81. Defendants excluded Plaintiff from meetings and decisions, diminished his role, terminated his employment, and denied him severance because of the known disability of his granddaughter, including because of the expense that her treatment would impose on Defendants' self-funded health plan.

82. Defendants acted intentionally and with malice or reckless indifference to Plaintiff's federally protected rights.

83. As a direct result, Plaintiff has suffered lost wages and benefits, emotional distress, humiliation, and other compensatory damages, in amounts to be proven at trial.

**COUNT III**

**Discrimination Because of Genetic Information—GINA, 42 U.S.C. § 2000ff-1(a)**

84. Plaintiff incorporates the preceding paragraphs.

85. Plaintiff's granddaughter is Plaintiff's "family member" within the meaning of 42 U.S.C. § 2000ff(3) and 29 C.F.R. § 1635.3(a). She is Plaintiff's dependent and his second-degree relative.

86. Alpha Thalassemia is an inherited genetic disorder. Information about the manifestation of that disorder in Plaintiff's granddaughter is "genetic information" with respect to Plaintiff—specifically, his family medical history. 42 U.S.C. § 2000ff(4)(A)(iii); 29 C.F.R. § 1635.3(b), (c)(1)(iii). To the extent her diagnosis was established through genetic testing, information about that testing is likewise Plaintiff's genetic information. 42 U.S.C. § 2000ff(4)(A)(ii).

87. Defendants acquired Plaintiff's genetic information on February 6, 2025, when Plaintiff told the co-CEOs of his granddaughter's diagnosis and her expected need for lifelong transfusions and chelation therapy.

88. Defendants discharged Plaintiff and otherwise discriminated against him with respect to the compensation, terms, conditions, and privileges of his employment because of that genetic information, including because of the anticipated cost to Defendants' self-funded plan of treating the manifested genetic disorder of Plaintiff's family member. 42 U.S.C. § 2000ff-1(a)(1).

89. Defendants acted intentionally and with malice or reckless indifference to Plaintiff's federally protected rights.

90. As a direct result, Plaintiff has suffered lost wages and benefits, emotional distress, humiliation, and other compensatory damages, in amounts to be proven at trial.

## COUNT IV

### Race Discrimination—Title VII, 42 U.S.C. § 2000e-2(a)(1)

91. Plaintiff incorporates the preceding paragraphs.

92. Plaintiff is white.

93. Severance pay is compensation and a term, condition, and privilege of employment.

94. Defendants at least considered offering severance to a former Black employee upon that employee's separation. That Black employee was—like Plaintiff—in a leadership role with others reporting to him.

95. Nonetheless, Defendants told Plaintiff that they were not offering him severance because they "don't pay severance" due to their status as a smaller company, which was false. Defendants shifted their reason for denying severance when confronted by Plaintiff.

96. Defendants denied Plaintiff severance because of his race.

97. Defendants acted intentionally and with malice or reckless indifference to Plaintiff's federally protected rights, and Plaintiff has suffered pecuniary and non-pecuniary damages as a result.

## COUNT V

## Race Discrimination (Mixed Motive)—Title VII, 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)

98. Plaintiff incorporates the preceding paragraphs.

99. This Count is pleaded in the alternative to Count IV.

100. Plaintiff is white.

101. Severance pay is compensation and a term, condition, and privilege of employment.

102. Defendants at least considered offering severance to a former Black employee upon their separation. That Black employee was in a comparable position to Plaintiff.

103. Nonetheless, Defendants told Plaintiff that they were not offering him severance because they "don't pay severance" based on their status as a smaller company, which was false. Defendants shifted their reason for denying severance when confronted by Plaintiff.

104. Plaintiff's race was at least a motivating factor in Defendants' decision to deny him severance. 42 U.S.C. § 2000e-2(m).

105. As a direct result, Plaintiff has lost the value of the severance Defendants offered to similarly situated employees, has suffered emotional distress and humiliation, and has incurred other damages in amounts to be proven at trial.

106. Plaintiff is entitled to all relief available under 42 U.S.C. §§ 2000e-5(g) and 1981a(a)(1). At a minimum, Plaintiff is entitled to declaratory relief, injunctive relief, and attorney fees and costs under 42 U.S.C. § 2000e-5(g)(2)(B)(i).

## COUNT VI

## Race Discrimination in the Making, Performance, and Enforcement of Contracts—42 U.S.C. § 1981

107. Plaintiff incorporates the preceding paragraphs.

108. Section 1981 guarantees all persons the same right "to make and enforce contracts."

109. The right to "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

110. The offering of severance to departing employees is a benefit, privilege, term, and condition of the employment relationship.

111. Severance is also offered through a separate contract.

112. Defendants have at least discussed the possibility of offering severance to a similarly situated Black employee. But Defendants denied severance to Plaintiff, who is white.

113. Defendants stated reason for denying severance—that they "don't pay severance" due to their status as a smaller company—is false. And when Plaintiff reminded Defendants that he had been in conversations with them about paying severance to other employees, Defendants' reason for the denial changed.

114. Defendants' conduct interfered with Plaintiff's right to make and enforce contracts and to enjoy the benefits, privileges, terms, and conditions of his contractual relationship with Defendants, in violation of 42 U.S.C. § 1981.

115. As a direct result, Plaintiff has lost the value of the severance Defendants denied him and has suffered emotional distress, humiliation, and other damages in amounts to be proven at trial.

116. Plaintiff is entitled to compensatory and punitive damages, reasonable attorney fees and costs, and all other remedies available under law.

## COUNT VII

### Interference With Protected Benefits—ERISA, 29 U.S.C. § 1140

117. Plaintiff incorporates the preceding paragraphs.

118. Defendants established and maintained a self-funded group health plan for their employees (the "Plan"). The Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1).

119. Plaintiff was a "participant" in the Plan, 29 U.S.C. § 1002(7), and his wife and granddaughter were "beneficiaries," 29 U.S.C. § 1002(8).

120. Because the Plan was self-funded, claims incurred by Plaintiff and his dependents were paid from Defendants' own assets.

121. Defendants knew, no later than February 6, 2025, that Plaintiff's granddaughter would require ongoing, lifelong, and expensive treatment that would be paid for under the Plan.

122. Defendants discharged Plaintiff with the specific intent and for the purpose of interfering with the attainment of rights to which Plaintiff and his beneficiaries were and would have become entitled under the Plan, namely, to avoid paying the anticipated cost of their covered medical care.

123. Defendants' specific intent is shown by, among other things, Sarah Pillen's statement that a handful of employees accounted for approximately 80% of the company's health-care costs, Defendants' written encouragement that employees seek coverage elsewhere because of rising plan costs, the abrupt change in Defendants' treatment of Plaintiff immediately after his February 6, 2025 disclosure, and Defendants' termination of Plaintiff approximately twelve weeks later without a legitimate explanation.

124. Moreover, Defendants failed to provide Plaintiff with timely notice of his rights under COBRA, and they only did so after Plaintiff sent a letter requesting the information.

125. Plaintiff has no adequate remedy at law for this violation and is entitled to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including reinstatement, restoration of Plan participation for himself and his beneficiaries, restitution and surcharge in the amount of the compensation and benefits lost as a result of the violation, injunctive relief, and attorney fees and costs under 29 U.S.C. § 1132(g)(1).

**COUNT VIII**

**Disability-Association—Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1104(1), 48-1107.01, 48-1107.02(1)(d)**

126. Plaintiff incorporates the preceding paragraphs.

127. Defendants excluded Plaintiff from equal jobs and benefits and discharged him because of the known disability of an individual with whom Plaintiff is known to have a family relationship and association, in violation of Neb. Rev. Stat. §§ 48-1104(1), 48-1107.01(1), and 48-1107.02(1)(d).

128. Plaintiff has suffered physical, emotional, and financial harm as a result and is entitled to general and special damages, injunctive relief, and attorney fees and costs under Neb. Rev. Stat. § 48-1119(4).

**COUNT IX**

**Race Discrimination— Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1104(1)**

129. Plaintiff incorporates the preceding paragraphs.

130. Defendants discriminated against Plaintiff with respect to compensation and the privileges of employment because of his race by denying him severance, in violation of Neb. Rev. Stat. § 48-1104(1).

131. Plaintiff has suffered physical, emotional, and financial harm as a result and is entitled to general and special damages, injunctive relief, and attorney fees and costs under Neb. Rev. Stat. § 48-1119(4).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

a. That the practices of Defendants complained of herein be adjudged, decreed, and declared to be a violation of the rights secured to Plaintiff as set forth in this Complaint.

b. That a permanent prohibitory injunction be issued requiring that Defendants adopt employment practices in conformity with the requirements of the law.

c. That Defendants be required to make Plaintiff whole for their adverse, retaliatory, discriminatory, and unlawful actions through restitution in the form of back pay, including the monetary value of any employment benefits Plaintiff would have been entitled to as an employee of Defendants, with interest of an appropriate inflation factor.

d. That Plaintiff be awarded front pay and the monetary value of any employment benefits they would have entitled to going forward.

e. That Plaintiff be awarded compensatory damages, including but not limited to loss of past and future income, emotional distress, mental anguish, dignitary harm, loss of reputation, and related damages, in an amount to be determined at trial.

f. That Plaintiff be awarded punitive damages.

g. That Plaintiff be awarded liquidated damages.

h. That the Court award Plaintiff's attorney fees, legal costs, expenses, and disbursements.

i. That the Court award Plaintiff pre-judgment interest.

j. That the Court award Plaintiff post-judgment interest.

k. That the Court grant such other and further relief as it deems fair and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

## PLACE OF TRIAL

Pursuant to NECivR 40.1(b), Plaintiff requests that the place of trial be Lincoln, Nebraska.

Dated: _October 23, 2026

**ZAIN SHIRAZI LAW PLLC**

_/s/ Zain Shirazi_________________
Zain Shirazi
MN No. 0506031 (Admitted to D. Neb.)
1 West Water St.,
Suite 275
Saint Paul, MN 55107
T: (651) 217-1999
zain@zainshirazilaw.com

*ATTORNEY FOR PLAINTIFF*